FILED

2017 AUG 25 PM 4: 03

U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

| | |
|---|---|
| *RANDY EVANS,* ) | |
| ) | Civil Action |
| Plaintiff, ) | No. 6:17-CV-1553-ORL-37-DCI |
| ) | |
| v. ) | |
| ) | |
| *OCWEN LOAN SERVICING, LLC,* ) | |
| ) | |
| Defendant. ) | |
| ) | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Randy Evans, alleges violation of the Florida Consumer Collection Practices Act § 559.55 *et seq.* ("FCCPA"), the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 *et seq.* ("RESPA"), and negligent and fraudulent misrepresentation against Defendant, Ocwen Loan Servicing, LLC ("Ocwen").

### JURISDICTION AND VENUE

1.     The Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises out of RESPA, a federal statute.

2.     The Court has supplemental jurisdiction over the state claims under 28 U.S.C. § 1367 because the basis of the federal claim involves the same conduct that supports the state claim.

3.     The Court has personal jurisdiction because Ocwen conducts business in Orlando, Florida.

4.      Venue is proper in this District because the acts causing the Plaintiff's claims occurred here.

## PARTIES

5.      Plaintiff is a natural person who resides in Florida.

6.      Defendant Ocwen is a Florida for-profit corporation with its principal place of business in West Palm Beach, Florida.

## FACTUAL ALLEGATIONS

7.      In September 2005, Plaintiff purchased a home at 19636 County Road 455, Clermont, Florida.

8.      Plaintiff took out a $395,500 mortgage secured by a note ("Mortgage") with Quicken Loans to buy the home. The mortgage is attached as Exhibit "A."

9.      In 2013, Ocwen became the servicer of the Plaintiff's Mortgage.

10.      Quicken Loans assigned the Mortgage to Deutsche Bank National Trust company as trustee for residential asset securitization trust 200s-a16 mortgage pass-through certificates, series 2005-p in February 2016.

11.      On or about March 3, 2016, Ocwen hired Robertson, Anschutz & Schneid who sued Plaintiff seeking to foreclose on the Plaintiff's home, which forced Plaintiff to hire the Smothers Law Firm, P.A. to represent him against Ocwen. Plaintiff paid $500 per month to Smothers Law Firm to defend the foreclosure lawsuit.

### Ocwen's false misrepresentations about loss mitigation

12.      In early 2013, Plaintiff's wife was diagnosed with terminal brain cancer, which required Plaintiff to be the sole caregiver for her and their adult mentally disabled son.

13.     Plaintiff recognized the severe impact his wife's devastating diagnosis would have on his family's financial future. Plaintiff contacted Ocwen to discuss options because of their pending financial struggle despite being current on their mortgage payments.

14.     On November 7, 2013, Ocwen sent a letter informing Plaintiff of his assigned mortgage assistance expert. The letter also advised Plaintiff of the information necessary to submit a complete loss mitigation application.

15.     The letter advised that once the loss mitigation application was complete, Ocwen would carefully review the Plaintiff's situation and determine the best options for Plaintiff.

16.     On or about December 12, 2013, Plaintiff submitted a complete loss mitigation application.

17.     After December 12, 2013, Plaintiff spoke with several of Ocwen's representatives including "Alya" and "Syed" about the availability of loss mitigation options.

18.     Instead of offering the best options, Ocwen's representatives told Plaintiff flat out that Ocwen would grant no loan modification until he defaulted on the Mortgage.

19.     Plaintiff felt humiliated that he trusted Ocwen to "work" with him and provide him with loss mitigation relief.

20.     Plaintiff confirmed Ocwen's false statements in a letter sent to Ocwen on June 1, 2015, stating:

> "In the past your company has told me that it will not work with me concerning a mortgage remodification loan because I continued to make my mortgage payments. I have decided to take your advice by being delinquent on at least two mortgage payments. I am working on the mortgage remodification package you sent me at this time. I appreciate your patience."

The letter is attached as Exhibit "B."

21.     Ocwen intended Plaintiff to rely on its false statements, and default on the Mortgage, because Ocwen stood to gain a tremendous financial profit from the default-related fees and costs it could charge.

22.     Plaintiff relied on Ocwen's false statements and defaulted on his Mortgage payments in May and June of 2015, hoping to save his home from foreclosure.

23.     Ocwen never intended to give available loss mitigation options to Plaintiff until he defaulted on the Mortgage. As demonstrated by Ocwen only offering Plaintiff a trial period plan in July 2015—after he defaulted on the Mortgage in May and June of 2015.

24.     Ocwen knew its statements to Plaintiff were false because it signed a Consent Order ("Order") with the Consumer Financial Protection Bureau and 48 states prohibiting Ocwen from telling borrowers that their loans must be in default before loss mitigation options were considered. http://files.consumerfinance.gov/f/201312_cfpb_consent-order_ocwen.pdf

25.     The Order provided: "[Ocwen] shall not instruct, advise or recommend that borrowers go into default in order to qualify for loss mitigation relief." Order, A-31 pg. 97, ¶ 8.

26.     Because of its fraudulent statements, Ocwen foreclosed on the Plaintiff's home. This allowed Ocwen to charge thousands of dollars in default-related fees and costs to the Plaintiff.

27.     Ocwen's illegal conduct caused Plaintiff to live every day in a constant state of anxiety and worry over possibly losing his home, which caused him severe mental distress.

28.     From 2013 through 2015, Plaintiff did everything he could to work with Ocwen and save his home. Unfortunately, Ocwen stymied those efforts and foreclosed on his home anyway.

### Ocwen's failure to respond and provide important information
### about loss mitigation and reinstatement

29.     Because Ocwen refused to provide information about loss mitigation options, Plaintiff was desperate to find help.

30.     Unfortunately, in April 2015, Plaintiff hired the Homeowner's Foundation, Inc. ("HFI") to work with Ocwen and save his home from foreclosure.

31.     From April 2015 through June 2015, HFI worked in concert with Ocwen to determine the "best" loss mitigation option available.

32.     HFI told Plaintiff that Ocwen would give him a permanent loan modification with a low interest rate and a lower monthly mortgage payment.

33.     In June of 2015, Ocwen offered a loan modification trial period plan to Plaintiff. HFI conveyed this offer and advised Plaintiff that he must make three trial payments, and after completing the payments, he would receive the permanent loan modification.

34.     On or about July 6th, 7th, and 28th, Plaintiff paid $1,367.36 to Ocwen, which Ocwen accepted.

35.     By late July 2015, Plaintiff had yet to receive any final loan modifications documents from Ocwen.

36.     On August 2, 2015, Plaintiff contacted Ocwen about the final loan modifications documents. During this conversation, Plaintiff learned that Ocwen's loan modification terms differed completely from the terms HFI told Plaintiff. Particularly a $300,000 balloon payment.

37.     On August 17, 2015, Plaintiff received a copy of the final loan modification documents from Ocwen.

38.     Plaintiff didn't know what to do because Ocwen was telling him one thing, while HFI was telling him another.

39.     HFI ceased communication with Plaintiff about the loan modification.

40.     On or about October 26, 2015, Plaintiff mailed a letter to Ocwen advising of the discrepancies between the loan modification Ocwen offered and the one HFI offered.

41.     In the letter, Plaintiff expressed his belief that Ocwen and HFI were working together in a "scam." Plaintiff requested a new loan modification offer that resembled the terms HFI told him Ocwen agreed to.  Ocwen never responded to the Plaintiff's letter.

42.     On or about October 30, 2015, after he couldn't get information or answers from HFI or Ocwen, Plaintiff paid Ocwen $1,367.79.

43.     On or about November 25, 2015, Plaintiff sent another letter to Ocwen that explained HFI and Ocwen's misleading and untruthful statements about the loan modification. Plaintiff explained that both Ocwen and HFI never contacted him to explain the

discrepancies between the loan modification offers. Plaintiff also described how HFI had stolen money from him.

44.     On that same date, Plaintiff again paid Ocwen $1,367.79.

45.     On or about December 27, 2015, Plaintiff sent a written request to Ocwen asking for information on his loan. Plaintiff included all the information Ocwen needed to identify the Plaintiff's mortgage account information.

46.     In the letter, Plaintiff specifically asked Ocwen to send him information about the denial of the loan modification, Ocwen's conversations with HFI, and how Ocwen calculated the loan modification offer. On December 28, 2015, Plaintiff again paid Ocwen $1,367.79.

47.     Plaintiff received no response from Ocwen.

48.     On January 29, 2016, Plaintiff sent another letter to Ocwen advising that he received no response from Ocwen.

49.     On or about March 20, 2016, Plaintiff finally received a letter responding to Plaintiff's January 29, 2016, letter. The letter explained that Ocwen sent a letter on February 9, 2016, to HFI explaining why it denied Plaintiff from receiving a permanent loan modification. Ocwen's letter is attached as Exhibit "C."

50.     The letter did not advise Plaintiff of his right to appeal Ocwen's permanent loan modification denial.

51.     Ocwen sent the February 9, 2016 letter to HFI despite the Plaintiff's numerous letters telling Ocwen that HFI was running a "scam", and specifically asking Ocwen to send the information to Plaintiff.

52.     Ocwen's letter further explained that it denied the permanent loan modification because it never received the final loan modification documents executed by Plaintiff.

53.     In the letter, Ocwen never offered or informed Plaintiff of his right to enroll in another HAMP trial modification plan.

54.     On or about July 15, 2016, Smothers Law Firm sent a written request for information to Ocwen asking for a breakdown of the charges imposed on Plaintiff's Mortgage and the amount Plaintiff needed to pay to reinstate his Mortgage. The letter is attached as Exhibit "D."

55.     Ocwen failed to acknowledge this request within five days.

56.     On or about August 1, 2016, Smothers Law Firm received a reinstatement letter from Robertson, Anschutz & Schneid. The letter is attached as Exhibit "E."

57.     The letter stated: "This letter is in response to your request for a reinstatement figure. The amount due to reinstate is **$ 43,065.40** good through seven (7) days of the date of this letter pursuant to the itemized **Explanation of Charges** and the **Description of Charges** included herein. Please note that, by federal law, these amounts do not include any estimates."

58.     On or about August 12, 2016, Ocwen also sent a reinstatement letter to Smothers Law Firm. The letter is attached as Exhibit "F."

59.     The letter stated:

See below for a breakdown of the total amount required to reinstate the above referenced loan. **IMPORTANT!** If the loan is not reinstated and the payments fall further behind, we may refer the mortgage to foreclosure, or if the loan is already in foreclosure, we may continue with foreclosure proceedings. The

reinstatement amount is good through: 09/09/2016. If the account is reinstated, the next regular payment is due on: 10/01/2016

60.     The total amount due to reinstate the Mortgage was $38,681.08.

61.     Plaintiff and Smothers Law Firm were confused because the two letters had different amounts to reinstate the loan.

62.     Ocwen's reinstatement letter had $315.09 due for late charges, while Robertson, Anschutz & Schneid's reinstatement letter had $210.06 in accumulated late charges.

63.     The $315.09 fee for late charges is illegitimate because Ocwen had accelerated the Mortgage.

64.     Ocwen knew it accelerated the Mortgage, and that it could no longer charge late fees, but demanded Plaintiff pay them anyway to reinstate the Mortgage.

65.     Ocwen's letter also contained an illegitimate $75 "Projected Title Report Fee."

66.     The Mortgage prohibits Ocwen from charging any default related fee or cost unless it has been incurred.

67.     The $75 "Projected Title Fee" was illegitimate because it had not yet been incurred; yet, Ocwen demanded Plaintiff pay it to reinstate the Mortgage.

68.     The confusion caused by Ocwen and its counsel's communications caused Plaintiff to incur further attorney's fees by having to discuss these discrepancies with Smothers Law Firm.

69.     Ocwen included a breakdown of the charges and payments over the life of Plaintiff's Mortgage. The letter is attached as Exhibit "G."

70.     The Letter said "Our company has recently received a request for information on the above referenced loan, which is enclosed for your review."

71.     The letter contained a spreadsheet of the charges and payments over the course of the Plaintiff's Mortgage.

72.     However, the spreadsheet contained inaccurate information because it didn't contain default-related fees, like property inspection fees, charged to the Plaintiff's loan.

73.     This letter muddied the waters even more because Ocwen included none of the default-related fees and costs (evidenced in the reinstatement letters) in the breakdown of charges.

74.     Ocwen failed on numerous occasions to respond or acknowledge the Plaintiff's letters, requests for information, and notices of error.

75.     Ocwen also failed to update its records after receiving numerous letters from Plaintiff advising of HFI's foreclosure relief "scam."

76.     Ocwen's conduct caused Plaintiff to suffer from constant stress and anxiety that kept him up throughout the night.

77.     Plaintiff would spend hours hand writing letters to Ocwen pleading for information to save his home. Plaintiff would send these letters, spending money from his own pocket, by certified mail to Ocwen.

78.     Plaintiff described the severity of his mental anguish by stating his belief that if Ocwen put a gun to Plaintiff and his autistic son's head, it would have no problem pulling the trigger.

79.     Despite the Plaintiff's pleas, Ocwen played a game of "cat and mouse" with Plaintiff to keep him in foreclosure as long as possible; because the longer Plaintiff remained in foreclosure, the more profit Ocwen could earn from charging default-related fees and costs.

### Ocwen foreclosed and charged illegal default related fees and costs

80.     Once it induced Plaintiff to default on his loan, Ocwen charged default-related fees and costs to his Mortgage.

81.     From June 17, 2015 through November 21, 2016, Ocwen charged a $13.25 fee for an inspection of the Plaintiff's property.

82.     Upon information and belief, Ocwen overcharged for these property inspections fees to increase its profit at the expense of Plaintiff.

83.     These property inspections were also unnecessary and unreasonable because Plaintiff continually lived in and maintained the property at all times relevant.

84.     Stated differently, the property inspection fees were not reasonable or appropriate to preserve Quicken Loan or Deutsche Bank's interest in the Plaintiff's property.

85.     Ocwen also charged these property inspections more frequently than allowed.

86.     For example, on May 3, 2016, Ocwen charged Plaintiff $13.25 for a property inspection.

87.     Ten days later, on May 13, 2016, Ocwen again charged Plaintiff $13. 25 for a property inspection.

88.     On May 17, 2016, Ocwen sent a monthly mortgage statement demanding Plaintiff pay $426,149.04. Exhibit "H."

89.     The total amount demanded in each mortgage statement included the illegal property inspection fees.

90.     Ocwen knew these property inspection fees were illegal because the Order prohibited Ocwen from charging unnecessary and duplicative property inspection fees. Further, the Order prohibited Ocwen from charging property inspection fees more frequently than HUD guidelines allowed, which is every 25-35 days.

91.     The Order also prohibited Ocwen from imposing its own mark up on property inspection fees.

92.     Upon information and belief, Ocwen overcharged Plaintiff for these property inspection fees retaining the excess profit.

93.     Ocwen also charged Plaintiff for attorney's fees and costs in the foreclosure.

94.     Upon information and belief, these fees and costs do not represent the work actually performed in the foreclosure. Instead, Ocwen charged them as a flat fee with no regard to the time spent or work performed on the foreclosure.

95.     Ocwen charged these fees and costs, again, to increase its profit at Plaintiff's expense.

96.     Plaintiff has suffered financial loss because the illegal fees and costs were capitalized into Plaintiff's new principal balance, which he pays every month.

### Ocwen continued to charge illegal fees after Plaintiff permanently modified his Mortgage

97.     After Plaintiff complied with all conditions under the loan modification trial period plan, the Plaintiff's Mortgage was permanently modified on March 1, 2017.

98.     The Modification Agreement provided that Plaintiff's new principal balance was $454,451.82.

99.     The new principal balance included the illegal fees and costs Ocwen charged Plaintiff during default. The new principal balance also included legitimate amounts and arrearages due and owing.

100.    On March 1, 2017, Plaintiff's Mortgage was no longer in default.

101.    On or about April 3, 2017, Ocwen sent, which Plaintiff received, a monthly mortgage statement. Exhibit "I."

102.    The statement demanded Plaintiff pay a total amount due of $2,111.68. Included in the total amount due was a $645.00 "Civil Litigation" charge, which Ocwen imposed on March 22, 2017.

103.    Plaintiff was confused because his Mortgage was current, and according to the modification agreement, all past due amounts and arrearages were capitalized into the new principal balance.

104.    Plaintiff contacted Smothers Law Firm and discussed the improper charge.

105.    On or about May 8, 2017, Smothers Law Firm sent a written letter to Ocwen disputing the "Civil Litigation" charge. Exhibit "J."

106.    On or about May 19, 2017, Ocwen responded to Smothers Law Firm's letter. Exhibit "K."

107.    With its letter, Ocwen included an invoice from Robertson, Anschutz & Schneid that showed the $645 "Civil Litigation" charge was incurred on March 16, 2017, which was when Plaintiff's Mortgage was no longer in default.

108.    Despite the Mortgage being current, the invoice does not describe the services or work performed to substantiate the $645 fee.

109.    Ocwen's letter further indicated that it would continue demanding payment of the $645 fee from Plaintiff.

110.    Ocwen knew Plaintiff's Mortgage was current, but demanded Plaintiff pay the illegitimate "Civil Litigation" fee.

111.    On or about May 16, 2017, Ocwen sent, which Plaintiff received, a monthly mortgage statement demanding payment of $2,049.93. Exhibit "L."

112.    Ocwen added a $61.75 "Foreclosure Fee" into the total amount it demanded Plaintiff pay. The $61.75 "Foreclosure Fee" is illegitimate because the Plaintiff's Mortgage was current and not in foreclosure. Despite knowing the Plaintiff's Mortgage was current, Ocwen demanded payment of this illegitimate fee.

113.    On or about July 24, 2017, Plaintiff, through counsel, sent a written cure letter to Ocwen.

114.    After a reasonable amount of time, Plaintiff filed this lawsuit because Ocwen failed to cure the breach of its violations of state and federal law.

## COUNT I AS TO OCWEN'S INTENTIONAL MISREPRESENTATIONS

115.    Ocwen intentionally misrepresented material facts to Plaintiff about default being the pre-condition to receiving loss mitigation relief.

116.    Ocwen's statements to Plaintiff were false.

117.    Ocwen knew that loss mitigation relief required no default before Ocwen could provide that relief to Plaintiff.

118.    Ocwen intended Plaintiff to rely on its materially false statements so it could seek to foreclose on the Plaintiff's home and charge default-related fees and costs.

119.    Plaintiff relied on Ocwen's materially false statements and defaulted under the Mortgage believing he would receive reasonable and affordable loss mitigation options.

120.    Ocwen's fraudulent conduct caused substantial harm to Plaintiff described *supra*.

## COUNT II AS TO OCWEN'S NEGLIGENT MISREPRESENTATIONS

121.    Ocwen misrepresented material facts to Plaintiff about default being the pre-condition to receiving loss mitigation relief.

122.    Ocwen's statements to Plaintiff were false and it knew or should have known that its statements were false.

123.    Ocwen knew or should have known that loss mitigation relief required no default before Ocwen could provide that relief to Plaintiff.

124.    Ocwen intended Plaintiff to rely on its materially false statements so it could seek to foreclose on the Plaintiff's home and charge default-related fees and costs.

125.    Plaintiff justifiably relied on Ocwen's materially false statements and defaulted under the Mortgage believing he would receive reasonable and affordable loss mitigation options.

126.    Ocwen's fraudulent conduct caused substantial harm to Plaintiff described *supra*.

## COUNT III AS TO OCWEN'S VIOLATION OF THE
## REAL ESTATE SETTLEMENT PROCEDURES ACT 12 U.S.C. § 2605(k)(C), (E)

127.    Ocwen is a "servicer" because it was responsible for "servicing" Plaintiff's

mortgage loan and was scheduled to receive, and received, periodic payments from Plaintiff

under his mortgage loan and disbursed principal and interest from those amounts under the

loan. 12 U.S.C. § 2605(i)(2)–(3).

128.    Plaintiff's loan is a "federally related mortgage loan" because it is secured by

a first or subordinate lien on a residential real property designed for the occupancy of one to

four families, and was made in whole or in part by a lender with deposits or accounts insured

by the FDIC.

129.    As a servicer of a federally related mortgage loan, Ocwen must comply with

any regulation implementing RESPA. *See* 12 U.S.C. § 2605(k)(1)(E).

130.    Ocwen must respond to a notice of error related to a borrower's loss

mitigation options. 12 CFR § 1024.35(b)(7).

131.    In response to a notice of error, Ocwen must correct the error or conduct a

reasonable investigation and provide "the borrower with a written notification that includes a

statement that the servicer has determined that no error occurred, a statement of the reason or

reasons for this determination, a statement of the borrower's right to request documents relied

upon by the servicer in reaching its determination, information regarding how the borrower

can request such documents, and contact information, including a telephone number, for

further assistance." 12 CFR 1024.35(e)(1)(i)(B).

132.    Ocwen must maintain policies and procedures reasonably designed to ensure

that it can "[p]rovide accurate and timely disclosures to a borrower as required by this

subpart or other applicable law" and "[p]rovide a borrower with accurate and timely information and documents in response to the borrower's requests for information with respect to the borrower's mortgage loan." 12 CFR 1024.38(a)(b)(1)(i),(iii).

133.    On numerous occasions, Plaintiff and his counsel sent written "requests for information" and written notices of error to Ocwen about the Plaintiff's Mortgage, loss mitigation options, and amounts required for reinstatement of his loan. 12 C.F.R. § 1024.36.

134.    Ocwen responded to Plaintiff's written requests with inaccurate, unclear, and inconspicuous information. *See* 12 C.F.R. § 1024.36(d)(1)(i); *see* 12 C.F.R. 1024.38(a)(b)(1)(i),(iii).

135.    Further, Ocwen provided no documentation it relied on in asserting no errors were present on the Plaintiff's Mortgage.

136.    Ocwen violated § 2605(k)(1)(E) when it failed to provide information to Plaintiff in an accurate, clear and conspicuous manner, by charging illegal fees, and demanding Plaintiff pay these fees. 12 C.F.R. § 1024.32(a)(1); 12 U.S.C. § 2605(k)(1)(E).

137.    Ocwen has a pattern and practice of using form letters, like the letters at issue, that contain these inaccurate, unclear, and inconspicuous responses.

138.    Ocwen's pattern and practice of violating RESPA in the manner described *supra* is evidenced by the Order and the Florida Attorney General's Complaint against Ocwen for its illegal servicing conduct. http://myfloridalegal.com/webfiles.nsf/WF/JMAR-ALLN3V/$file/Complaint+Against+Ocwen.pdf

139.    Ocwen's violation of RESPA harmed Plaintiff by depriving him of the statutory right to accurate, clear, and conspicuous information about his mortgage loan. And

17

Plaintiff incurred postage fees, and attorney's fees and costs in having to follow up on Ocwen's letters, which contained unclear, inaccurate, and inconspicuous information.

140.   Because of Ocwen's pattern and practice of violating Ocwen, Plaintiff is entitled to actual damages, plus statutory damages under 12 U.S.C. § 2605(f), together with reasonable attorney's fees and costs.

### COUNT IV AS TO OCWEN'S VIOLATION OF THE FLORIDA CONSUMER COLLECTION PRACTICES ACT § 559.72(9)

141.   Plaintiff is a "consumer" as defined by Fla. Stat. § 559.55(8) when he purchased his home by mortgage.

142.   Ocwen is a "person" as defined under the FCCPA.

143.   Ocwen knowingly attempted to collect and collected an illegitimate "consumer debt" and attempted to enforce, claimed, and asserted a known non-existent legal right to a consumer debt when Ocwen sent communications to Plaintiff demanding payment of these illegal debts in reinstatement and monthly mortgage statements.

144.   Ocwen's violation of the FCCPA harmed Plaintiff by depriving him of the statutory right to accurate, clear, and conspicuous information concerning his mortgage loan.

145.   Additionally, Plaintiff incurred attorney's fees and costs in having to dispute amounts which were unclear, inaccurate and estimated, and he suffered the imminent risk of having to pay an illegal amount.

146.   The illegal amounts Ocwen charged to Plaintiff were capitalized into Plaintiff's new principal balance he pays every month, resulting in out-of-pocket monetary loss.

147.    Further, Plaintiff suffered severe mental and emotional distress because of Ocwen's demands of illegal amounts.

148.    Because of Ocwen's violation of the FCCPA, Plaintiff is entitled to actual damages, plus statutory damages under § 559.77(2) of the FCCPA, together with reasonable attorney's fees and costs.

## RELIEF REQUESTED

149.    Plaintiff requests a jury trial on all issues triable.

150.    Plaintiff specifically reserves the right to amend his Complaint to add a claim for punitive damages.

WHEREFORE, Plaintiff respectfully requests this Court to enter judgment against Defendant for the following:

a.    That Plaintiff be awarded actual damages, including but not limited to forgiveness of all amounts not owed;

b.    That Plaintiff be awarded statutory damages;

c.    That Plaintiff be awarded costs and attorney's fees;

d.    That Plaintiff be awarded declaratory and injunctive relief;

e.    That the Court enter an order that Defendant and its agents, or anyone acting on their behalf, are immediately restrained from altering, deleting or destroying any documents or records relating to Plaintiff and this Complaint; and

f.    Such other and further relief as the Court may deem just and proper.

Dated: August 21, 2017                    Respectfully submitted,

/s/ Darren R. Newhart
Darren R. Newhart, Esq.
Florida Bar No.: 0115546
E-mail: darren@cloorg.com
J. Dennis Card, Jr.

Florida Bar No.: 0487473
E-mail: DCard@Consumerlaworg.com
Consumer Law Organization, P.A.
721 US Highway 1, Suite 201
North Palm Beach, Florida 33408
Telephone: (561) 822-3446
Facsimile: (305) 574-0132